(Slip Opinion)	OCTOBER TERM, 2017	1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NATIONAL ASSOCIATION OF MANUFACTURERS *v.* DEPARTMENT OF DEFENSE ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 16–299.　Argued October 11, 2017—Decided January 22, 2018

The Clean Water Act (Act) generally prohibits "the discharge of any pollutant by any person," except in express circumstances.　33 U. S. C. §1311(a).　A "discharge of a pollutant" includes "any addition of any pollutant to navigable waters from any point source," §1362(12), and the statutory term "navigable waters," in turn, means "the waters of the United States," §1362(7).　Section §1311(a) contains important exceptions to the general prohibition on discharge of pollutants, including two permitting schemes that authorize certain entities to discharge pollutants into navigable waters: the National Pollutant Discharge Elimination System (NPDES) program administered by the Environmental Protection Agency (EPA) under §1342, and a program administered by the Army Corps of Engineers (Corps) under §1344.

The statutory term "waters of the United States" delineates the geographic reach of those permitting programs as well as other substantive provisions of the Act.　In 2015, the EPA and the Corps proffered a definition of that term through an agency regulation dubbed the Waters of the United States Rule (WOTUS Rule or Rule).　The WOTUS Rule "imposes no enforceable duty on any state, local, or tribal governments, or the private sector."　80 Fed. Reg. 37102.　As stated in its preamble, the Rule "does not establish any regulatory requirements" and is instead "a definitional rule that clarifies the scope of" the statutory term "waters of the United States."　*Id.*, at 37054.

There are two principal avenues of judicial review of an EPA action.　Generally, parties may file challenges to final EPA actions in federal district courts, typically under the Administrative Procedure

Syllabus

Act.  But the Clean Water Act enumerates seven categories of EPA actions for which review lies directly and exclusively in the federal courts of appeals, including, as relevant here, EPA actions "approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345," §1369(b)(1)(E), and EPA actions "issuing or denying any permit under section 1342," §1369(b)(1)(F).

Several parties, including petitioner National Association of Manufacturers (NAM), challenged the Rule in United States District Courts across the country.  Many parties, but not NAM, filed "protective" petitions for review in various Courts of Appeals to preserve their challenges should their District Court lawsuits be dismissed for lack of jurisdiction under §1369(b).  The circuit-court actions were consolidated and transferred to the Court of Appeals for the Sixth Circuit.  Meanwhile, the parallel actions in the District Courts continued.  NAM intervened as a respondent in the Sixth Circuit and, along with several other parties, moved to dismiss for lack of jurisdiction.  The Government opposed those motions, arguing that the challenges must be brought first in the Court of Appeals because the WOTUS Rule fell within subparagraphs (E) and (F) of §1369(b)(1).  The Sixth Circuit denied the motions to dismiss.

*Held*: Because the WOTUS Rule falls outside the ambit of §1369(b)(1), challenges to the Rule must be filed in federal district courts.  Pp. 9–20.

(a) Neither subparagraph (E) nor subparagraph (F) of §1369(b)(1) grants courts of appeals exclusive jurisdiction to review the WOTUS Rule in the first instance.  Pp. 9–17.

(1) Subparagraph (E) grants courts of appeals exclusive jurisdiction to review any EPA action "in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345."  33 U. S. C. §1369(b)(1)(E).  The WOTUS Rule does not fall within that provision.  To begin, the Rule is not an "effluent limitation," which the Act defines as "any restriction . . . on quantities, rates, and concentrations" of certain pollutants "which are discharged from point sources into navigable waters."  §1362(11).  The WOTUS Rule imposes no such restriction; instead, it announces a regulatory definition for a statutory term.  Nor does the Rule fit within subparagraph (E)'s "other limitation" language.  Congress' use of the phrase "effluent limitation or other limitation" suggests that an "other limitation" must be similar in kind to an "effluent limitation": that is, a limitation related to the discharge of pollutants.  This natural reading is reinforced by subparagraph (E)'s cross-references to §§1311, 1312, 1316, and 1345, which each impose restrictions on the discharge of certain pollutants.  The statutory structure thus confirms that an "other limitation" must also be some type of restriction on the

discharge of pollutants. Because the WOTUS Rule does no such thing, it falls outside the scope of subparagraph (E).

Even if the Government's reading of "effluent limitation or other limitation" were accepted, however, the Rule still does not fall within subparagraph (E) because it is not a limitation promulgated or approved "under section 1311." As subparagraph (E)'s statutory context makes clear, this phrase is most naturally read to mean that the effluent or other limitation must be approved or promulgated "pursuant to" or "by reason of the authority of" §1311. But the EPA did not promulgate or approve the WOTUS Rule under §1311, which neither directs nor authorizes the EPA to *define* a statutory phrase appearing elsewhere in the Act. Rather, the WOTUS Rule was promulgated or approved under §1361(a), which grants the EPA general rulemaking authority "to prescribe such regulations as are necessary to carry out [its] functions under" the Act.

The Government contends that the statutory language "under section 1311" poses no barrier to its reading of subparagraph (E) because the WOTUS Rule's practical effect is to make §1311's limitations applicable to the waters covered by the Rule. But the Government's "practical effects" test is not grounded in the statute, renders other statutory language superfluous, and ignores Congress' decision to grant courts of appeals exclusive jurisdiction only over seven enumerated types of EPA actions set forth in §1369(b)(1). Pp. 9–15.

(2) The Government fares no better under subparagraph (F), which grants courts of appeals exclusive and original jurisdiction to review any EPA action "in issuing or denying any permit under section 1342." §1369(b)(1)(F). That provision does not cover the WOTUS Rule, which neither issues nor denies NPDES permits issued under §1342. Seeking to avoid that conclusion, the Government invokes this Court's decision in *Crown Simpson Pulp Co.* v. *Costle*, 445 U. S. 193, 196, and argues that the WOTUS Rule falls under subparagraph (F) because it is "functionally similar" to issuing or denying a permit. But that construction misconstrues *Crown Simpson,* is unmoored from the statutory text, and would create surplusage in other parts of the statute. Pp. 15–17.

(b) The Government's policy arguments provide no basis to depart from the statute's plain language. First, the Government contends that initial circuit-court review of the WOTUS Rule would avoid a bifurcated judicial-review scheme under which courts of appeals would review individual actions issuing or denying permits, whereas district courts would review broader regulations governing those actions. But, as explained, Congress has made clear that rules like the WOTUS Rule must be reviewed first in federal district courts. *Crown*

Syllabus

*Simpson,* 445 U. S., at 197, distinguished.  Moreover, the bifurcation that the Government bemoans is no more irrational than Congress' choice to assign challenges to NPDES permits to circuit courts and challenges to §1344 permits to district courts, see §1369(b)(1)(E). And many of this Court's recent decisions regarding the agencies' application and definition of "waters of the United States" have originated in district courts, not the courts of appeals.  Second, the Court acknowledges that, as the Government argues, routing WOTUS Rule challenges directly to the courts of appeals may improve judicial efficiency.  But efficiency was not Congress' only consideration.  Had Congress wanted to prioritize efficiency, it could have authorized direct circuit-court review of all nationally applicable regulations, as it did under the Clean Air Act, instead of structuring judicial review as it did in §1369(b)(1).  Third, the Government argues that initial review in the courts of appeals promotes the important goal of national uniformity with regard to broad regulations.  Although that argument carries some logical force, Congress did not pursue that end at all costs.  Finally, contrary to the Government's contention, the presumption favoring court-of-appeals review of administrative action does not apply here, for the scope of subparagraphs (E) and (F) is set forth clearly in the statute.  *Florida Power & Light Co.* v. *Lorion*, 470 U. S. 729, 745, 737, distinguished.  Pp. 17–20.

817 F. 3d 261, reversed and remanded.

SOTOMAYOR, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 16–299

## NATIONAL ASSOCIATION OF MANUFACTURERS, PETITIONER *v.* DEPARTMENT OF DEFENSE, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[January 22, 2018]

JUSTICE SOTOMAYOR delivered the opinion of the Court.

What are the "waters of the United States"? As it turns out, defining that statutory phrase—a central component of the Clean Water Act—is a contentious and difficult task. In 2015, the Environmental Protection Agency (EPA) and the Army Corps of Engineers (Corps) tried their hand at proffering a definition through an agency regulation dubbed the Waters of the United States Rule (WOTUS Rule or Rule).[1] The WOTUS Rule prompted several parties, including petitioner National Association of Manufacturers (NAM), to challenge the regulation in federal court. This case, however, is not about the substantive challenges to the WOTUS Rule. Rather, it is about in which federal court those challenges must be filed.

There are two principal avenues of judicial review of an

---

[1] We note that some of the parties and the Court of Appeals below refer to the WOTUS Rule as the "Clean Water Rule." Throughout this opinion, we have opted to use the former term in lieu of the latter.

action by the EPA.  Generally, parties may file challenges to final EPA actions in federal district courts, ordinarily under the Administrative Procedure Act (APA).  But the Clean Water Act (or Act) enumerates seven categories of EPA actions for which review lies directly and exclusively in the federal courts of appeals.  See 86 Stat. 892, as amended, 33 U. S. C. §1369(b)(1).  The Government contends that the WOTUS Rule fits within two of those enumerated categories: (1) EPA actions "in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345," 33 U. S. C. §1369(b)(1)(E), and (2) EPA actions "in issuing or denying any permit under section 1342," §1369(b)(1)(F).

We disagree.  The WOTUS Rule falls outside the ambit of §1369(b)(1), and any challenges to the Rule therefore must be filed in federal district courts.

## I

### A

Although the jurisdictional question in this case is a discrete issue of statutory interpretation, it unfolds against the backdrop of a complex administrative scheme. The Court reviews below the aspects of that scheme that are relevant to the question at hand.

#### 1

Congress enacted the Clean Water Act in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  §1251(a).  One of the Act's principal tools in achieving that objective is §1311(a), which prohibits "the discharge of any pollutant by any person," except in express circumstances.  A "discharge of a pollutant" is defined broadly to include "any addition of any pollutant to navigable waters from any point source," such as a pipe, ditch, or other "discernible, confined and discrete conveyance."  §§1362(12), (14).  And "navigable

waters," in turn, means "the waters of the United States, including the territorial seas." §1362(7). Because many of the Act's substantive provisions apply to "navigable waters," the statutory phrase "waters of the United States" circumscribes the geographic scope of the Act in certain respects.

Section 1311(a) contains important exceptions to the prohibition on discharge of pollutants. Among them are two permitting schemes that authorize certain entities to discharge pollutants into navigable waters. See *Rapanos* v. *United States*, 547 U. S. 715, 723 (2006) (plurality opinion). The first is the National Pollutant Discharge Elimination System (NPDES) program, which is administered by the EPA under §1342. Under that program, the EPA issues permits allowing persons to discharge pollutants that can wash downstream "upon [the] condition that such discharge will meet . . . all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343." §1342(a)(1). "NPDES permits impose limitations on the discharge of pollutants, and establish related monitoring and reporting requirements, in order to improve the cleanliness and safety of the Nation's waters." *Friends of the Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.*, 528 U. S. 167, 174 (2000). One such limitation is an "effluent limitation," defined in the Act as a "restriction . . . on quantities, rates, and concentrations" of specified pollutants "discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance." §1362(11).

The second permitting program, administered by the Corps under §1344, authorizes discharges of "'dredged or fill material,'" which "are solids that do not readily wash downstream." *Rapanos*, 547 U. S., at 723 (plurality opinion). Although the Corps bears primary responsibility in determining whether to issue a §1344 permit, the EPA retains authority to veto the specification of a site for

discharge of fill material.  See §1344(c).[2]

2

The statutory term "waters of the United States" delin-eates the geographic reach of many of the Act's substan-tive provisions, including the two permitting programs outlined above.  In decades past, the EPA and the Corps (collectively, the agencies) have struggled to define and apply that statutory term.  See, *e.g.*, 42 Fed. Reg. 37124, 37127 (1977); 51 Fed. Reg. 41216–41217 (1986).  And this Court, in turn, has considered those regulatory efforts on several occasions, upholding one such effort as a permissi-ble interpretation of the statute but striking down two others as overbroad.  Compare *United States* v. *Riverside Bayview Homes, Inc.*, 474 U. S. 121 (1985) (upholding the Corps' interpretation that "waters of the United States" include wetlands adjacent to navigable waters), with *Solid Waste Agency of Northern Cook Cty.* v. *Army Corps of Engineers*, 531 U. S. 159 (2001) (rejecting application of the Corps' interpretation of "waters of the United States" as applied to sand and gravel pit); and *Rapanos*, 547 U. S., at 729, 757 (plurality opinion) (remanding for further review the Corps' application of the Act to wetlands lying "near ditches or man-made drains that eventually empty into traditional navigable waters").

In 2015, responding to repeated calls for a more precise definition of "waters of the United States," the agencies jointly promulgated the WOTUS Rule.  80 Fed. Reg. 37054 (final rule).  The WOTUS Rule was intended to "provid[e] simpler, clearer, and more consistent approaches for iden-

---

[2] Both permitting programs allow the States to operate their own permitting schemes to govern waters within their borders.  See 33 U. S. C. §§1342(b), 1344(g).  Many States have opted to operate an NPDES permitting program under §1342(b), and two have done so under §1344(g).

tifying the geographic scope of the [Act]." *Id.*, at 37057. To that end, the Rule separates waters into three jurisdictional groups—waters that are categorically jurisdictional (*e.g.*, interstate waters); those that require a case-specific showing of their significant nexus to traditionally covered waters (*e.g.*, waters lying in the flood plain of interstate waters); and those that are categorically excluded from jurisdiction (*e.g.,* swimming pools and puddles). See 33 CFR §328.3 (2017); 80 Fed. Reg. 37057. Although the revised regulatory definition "applies broadly to [the Act's] programs," the WOTUS Rule itself states that it "imposes no enforceable duty on any state, local, or tribal governments, or the private sector." 80 Fed. Reg. 37102. Indeed, the Rule's preamble states that it "does not establish any regulatory requirements" and is instead "a definitional rule that clarifies the scope of" the statutory term "waters of the United States." *Id.*, at 37054.

B

As noted above, the Act contemplates two primary avenues for judicial review of EPA actions, each with its own unique set of procedural provisions and statutes of limitations. For "certain suits challenging some agency actions," the Act grants the federal courts of appeals original and "exclusive" jurisdiction. *Decker* v. *Northwest Environmental Defense Center*, 568 U. S. 597, 608 (2013). Seven categories of EPA actions fall within that jurisdictional provision; they include actions of the EPA Administrator—

> "(A) in promulgating any standard of performance under section 1316 of this title, (B) in making any determination pursuant to section 1316(b)(1)(C) of this title, (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title, (D) in making any determination as to a State permit program submitted under section

> 1342(b) of this title, (E) in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345 of this title, (F) in issuing or denying any permit under section 1342 of this title, and (G) in promulgating any individual control strategy under section 1314(*l*) of this title."    33 U. S. C. §1369(b)(1).

To challenge those types of actions, a party must file a petition for review in the court of appeals for the "judicial district in which [the party] resides or transacts business which is directly affected by" the challenged action. *Ibid.* Any such petition must be filed within 120 days after the date of the challenged action. *Ibid.* If there are multiple petitions challenging the same EPA action, those petitions are consolidated in one circuit, chosen randomly from among the circuits in which the petitions were filed. See 28 U. S. C. §2112(a)(3). Section 1369(b) also contains a preclusion-of-review provision, which mandates that any agency action reviewable under §1369(b)(1) "shall not be subject to judicial review in any civil or criminal proceeding for enforcement." 33 U. S. C. §1369(b)(2).

The second avenue for judicial review covers final EPA actions falling outside the scope of §1369(b)(1). Those actions are typically governed by the APA.[3] Under the APA, an aggrieved party may file suit in a federal district court to obtain review of any "final agency action for which there is no other adequate remedy in a court." See 5 U. S. C. §704. Those suits generally must be filed within six years after the claim accrues. 28 U. S. C. §2401(a).

## C

Soon after the agencies promulgated the WOTUS Rule,

---

[3] The Act also grants federal district courts jurisdiction over certain kinds of citizen enforcement actions. See 33 U. S. C. §1365(a); *Decker*, 568 U. S., at 607–08.

several parties, including NAM, challenged the Rule in United States District Courts across the country. The Judicial Panel on Multidistrict Litigation (JPML) denied the Government's request to consolidate and transfer those actions to a single district court. See Order Denying Transfer in *In re Clean Water Rule*, MDL No. 2663, Doc. 163 (Oct. 13, 2015).

Uncertainty surrounding the scope of the Act's judicial-review provision had also prompted many parties—but not NAM—to file "protective" petitions for review in various Courts of Appeals to preserve their challenges in the event that their District Court lawsuits were dismissed for lack of jurisdiction under §1369(b). The JPML consolidated these appellate-court actions and transferred them to the Court of Appeals for the Sixth Circuit. See Consolidation Order in *In re EPA and Dept. of Defense Final Rule*, MCP No. 135, Doc. 3 (July 28, 2015). The Court of Appeals thereafter issued a nationwide stay of the WOTUS Rule pending further proceedings. See *In re EPA and Dept. of Defense Final Rule*, 803 F. 3d 804 (CA6 2015).

Meanwhile, parallel litigation continued in the District Courts. Some District Courts dismissed the pending lawsuits, concluding that the courts of appeals had exclusive jurisdiction over challenges to the Rule. See *Murray Energy Corp.* v. *EPA*, 2015 WL 5062506, \*6 (ND W. Va., Aug. 26, 2015) (dismissing for lack of jurisdiction); *Georgia* v. *McCarthy*, 2015 WL 5092568, \*3 (SD Ga., Aug. 27, 2015) (concluding that court lacked jurisdiction to enter preliminary injunction). One District Court, by contrast, held that it had jurisdiction to review the WOTUS Rule. See *North Dakota* v. *EPA*, 127 F. Supp. 3d 1047, 1052–1053 (ND 2015).

NAM intentionally did not file a protective petition in any court of appeals to "ensure that [it] could challenge the Sixth Circuit's jurisdiction." Brief for Petitioner 1, n. 1. Instead, NAM intervened as a respondent in the

Sixth Circuit and, along with several other parties, moved to dismiss for lack of jurisdiction.[4]  The Government opposed those motions, arguing that challenges to the WOTUS Rule must be brought first in the Court of Appeals because the Rule fell within subparagraphs (E) and (F) of §1369(b)(1).  The Court of Appeals denied the motions to dismiss in a fractured decision that resulted in three separate opinions.  *In re Dept. of Defense*, 817 F. 3d 261 (2016).  The Court of Appeals denied rehearing en banc.  We granted certiorari, 580 U. S. ___ (2017), and now reverse.[5]

_____

[4] Some of the parties who filed protective petitions moved to dismiss those same petitions, agreeing with NAM that direct review of the WOTUS Rule belonged in the United States District Courts.  Many of those parties, though nominally respondents before this Court, filed briefs in support of NAM.

[5] There have been a number of developments since the Court granted review in this case.  In February 2017, the President issued an Executive Order directing the agencies to propose a rule rescinding or revising the WOTUS Rule.  See Exec. Order No. 13778, 82 Fed. Reg. 12497.  On July 27, 2017, the agencies responded to that directive by issuing a proposed rule.  See Definition of "Waters of the United States"—Recodification of Pre-Existing Rules, 82 Fed. Reg. 34899, 34901–34902.  That proposed rule, once implemented, would rescind the WOTUS Rule and recodify the pre-2015 regulatory definition of "waters of the United States."  See *ibid.*  Then, in November 2017, following oral argument in this case, the agencies issued a second proposed rule establishing a new effective date for the WOTUS Rule.  Definition of "Waters of the United States"—Addition of an Applicability Date to 2015 Clean Water Rule, 82 Fed. Reg. 55542 (explaining that the 2015 WOTUS Rule had an original effective date of Aug. 28, 2015).  That November 2017 proposed rule sets a new effective date of "two years from the date of final action on [the agencies'] proposal," to "ensure that there is sufficient time for the regulatory process for reconsidering the definition of 'waters of the United States' to be fully completed."  *Id.*, at 55542–55544.

The parties have not suggested that any of these subsequent developments render this case moot.  That is for good reason.  Because the WOTUS Rule remains on the books for now, the parties retain "'a concrete interest'" in the outcome of this litigation, and it is not "'im-

II

As noted, §1369(b)(1) enumerates seven categories of EPA actions that must be challenged directly in the federal courts of appeals. Of those seven, only two are at issue in this case: subparagraph (E), which encompasses actions "approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345," §1369(b)(1)(E), and subparagraph (F), which covers actions "issuing or denying any [NPDES] permit," §1369(b)(1)(F).[6] We address each of those statutory provisions in turn.

A

Subparagraph (E) grants courts of appeals exclusive jurisdiction to review any EPA action "in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, 1316, or 1345." 33 U. S. C. §1369(b)(1)(E). The Government contends that "EPA's action in issuing the" WOTUS Rule "readily qualifies as an action promulgating or approving an 'other limitation' under section 1311," because the Rule establishes the "geographic scope of limitations promulgated under Section 1311." Brief for Federal Respondents 18–19. We disagree.

To begin, the WOTUS Rule is not an "effluent limitation"—a conclusion the Government does not meaningfully

---

possible for a court to grant any effectual relief . . . to the prevailing party.'" *Chafin* v. *Chafin*, 568 U. S. 165, 172 (2013) (quoting *Knox* v. *Service Employees*, 567 U. S. 298, 307 (2012)). That remains true even if the agencies finalize and implement the November 2017 proposed rule's new effective date. That proposed rule does not purport to rescind the WOTUS Rule; it simply delays the WOTUS Rule's effective date.

[6] It is undisputed that the WOTUS Rule does not fall within the remaining five categories set forth in §1369(b)(1).

dispute. An "effluent limitation" is "any restriction . . . on quantities, rates, and concentrations" of certain pollutants "which are discharged from point sources into navigable waters." §1362(11). The WOTUS Rule imposes no such restriction. Rather, the Rule announces a regulatory definition for a statutory term and "imposes no enforceable duty" on the "private sector." See 80 Fed. Reg. 37102.

The Government instead maintains that the WOTUS Rule is an "other limitation" under subparagraph (E). Although the Act provides no express definition of that residual phrase, the text and structure of subparagraph (E) tell us what that language means. And it is not as broad as the Government insists.

For starters, Congress' use of the phrase "effluent limitation or other limitation" in subparagraph (E) suggests that an "other limitation" must be similar in kind to an "effluent limitation": that is, a limitation related to the discharge of pollutants. An "other limitation," for instance, could be a non-numerical operational practice or an equipment specification that, like an "effluent limitation," restricts the discharge of pollutants, even though such a limitation would not fall within the precise statutory definition of "effluent limitation." That subparagraph (E) cross-references §§1311, 1312, 1316, and 1345 reinforces this natural reading. The unifying feature among those cross-referenced sections is that they impose restrictions on the discharge of certain pollutants. See, *e.g.,* 33 U. S. C. §1311 (imposing general prohibition on "the discharge of any pollutant by any person"); §1312 (governing "water quality related effluent limitations"); §1316 (governing national performance standards for new sources of discharges); §1345 (restricting discharges and use of sewage sludge). In fact, some of those sections give us concrete examples of the type of "other limitation" Congress had in mind. Section 1311(b)(1)(C) allows the EPA to issue "any more stringent limitation[s]" if technology-

based effluent limitations cannot "meet water quality standards, treatment standards, or schedules of compliance." And §1345(d)(3) provides that, if "it is not feasible to prescribe or enforce a numerical limitation" on pollutants in sewage sludge, the EPA may "promulgate a design, equipment, management practice, or operational standard." All of this demonstrates that an "other limitation," at a minimum, must also be some type of restriction on the discharge of pollutants. Because the WOTUS Rule does no such thing, it does not fit within the "other limitation" language of subparagraph (E).

The Government tries to escape this conclusion by arguing that subparagraph (E) expressly covers "*any* effluent limitation or other limitation," §1369(b)(1)(E) (emphasis added), and that the use of the word "any" makes clear that Congress intended subparagraph (E) to sweep broadly and encompass all EPA actions imposing limitations of any sort under the cross-referenced sections. True, use of the word "any" will sometimes indicate that Congress intended particular statutory text to sweep broadly. See, *e.g.*, *Ali* v. *Federal Bureau of Prisons*, 552 U. S. 214, 220 (2008) ("Congress' use of 'any' to modify 'other law enforcement officer' is most naturally read to mean law enforcement officers of whatever kind"). But whether it does so necessarily depends on the statutory context, and the word "any" in this context does not bear the heavy weight the Government puts upon it. Contrary to the Government's assertion, the word "any" cannot expand the phrase "other limitation" beyond those limitations that, like effluent limitations, restrict the discharge of pollutants. In urging otherwise, the Government reads the words "effluent limitation and other" completely out of the statute and insists that what Congress really meant to say is "any limitation" under the cross-referenced sections. Of course, those are not the words that Congress wrote, and this Court is not free to "rewrite the statute" to the Gov-

ernment's liking.  *Puerto Rico* v. *Franklin Cal. Tax-Free Trust*, 579 U. S. ___, ___ (2016) (slip op., at 14) ("[O]ur constitutional structure does not permit this Court to rewrite the statute that Congress has enacted" (internal quotation marks omitted)).

Even if the Court accepted the Government's reading of "effluent limitation or other limitation," however, the Rule still does not fall within subparagraph (E) because it is not a limitation promulgated or approved "under section 1311."[7]  §1369(b)(1)(E).  This Court has acknowledged that the word "under" is a "chameleon" that "must draw its meaning from its context."  *Kucana* v. *Holder*, 558 U. S. 233, 245 (2010) (internal quotation marks omitted).  With respect to subparagraph (E), the statutory context makes clear that the prepositional phrase—"under section 1311"—is most naturally read to mean that the effluent limitation or other limitation must be approved or promulgated "pursuant to" or "by reason of the authority of" §1311.  See *St. Louis Fuel and Supply Co., Inc.* v. *FERC*, 890 F. 2d 446, 450 (CADC 1989) (R. B. Ginsburg, J.) ("'under' means 'subject [or pursuant] to' or 'by reason of the authority of'"); cf. Black's Law Dictionary 1368 (5th ed. 1979) (defining "under" as "according to").  Here, the EPA did not promulgate or approve the WOTUS Rule under §1311.  As noted above, §1311 generally bans the discharge of pollutants into navigable waters absent a permit.  Nowhere does that provision direct or authorize the EPA to *define* a statutory phrase appearing elsewhere in the Act.  In fact, the phrase "waters of the United States" does not appear in §1311 at all.  Rather, the WOTUS Rule was promulgated or approved under §1361(a), which

---

[7] Because no party argues that the WOTUS Rule is an EPA action approving or promulgating an effluent limitation or other limitation under §1312, §1316, or §1345, the Court confines its analysis to §1311.

grants the EPA general rulemaking authority "to pre-
scribe such regulations as are necessary to carry out [its]
functions under" the Act. Proving the point, the Govern-
ment's own brief cites §1361(a) as the statutory provision
that "authorized the [EPA] to issue the [WOTUS] Rule."
Brief for Federal Respondents 17, n. 3.[8]

The Government nonetheless insists that the language
"under section 1311" poses no barrier to its reading of
subparagraph (E) because the "[WOTUS] Rule's legal and
practical effect is to make effluent and other limitations
under Section 1311 applicable to the waters that the Rule
covers." *Id.*, at 28. But the Government's "practical-
effects" test is not grounded in the statutory text. Subpar-
agraph (E) encompasses EPA actions that "approv[e] or
promulgat[e] any effluent limitation or other limitation
under section 1311," not EPA actions that have the "legal
or practical effect" of making such limitations applicable
to certain waters. Tellingly, the Government offers no
textual basis to read its "practical-effects" test into
subparagraph (E).

Beyond disregarding the statutory text, the Govern-
ment's construction also renders other statutory language
superfluous. Take, for instance, subparagraph (E)'s cross-
references to §§1312 and 1316. See §1369(b)(1)(E) (cover-
ing EPA action "in approving or promulgating any effluent
limitation or other limitation under section 1311, *1312*,

———————
[8] It is true that the agencies cited §1311 among the provisions under
which they purported to have issued the Rule. See 80 Fed. Reg. 37055.
They also cited other provisions, including §§1314, 1321, 1341, 1342,
and 1344. *Ibid.* As noted, however, §1311 grants the EPA no authority
to clarify the regulatory definition of "waters of the United States."
Furthermore, the agencies' passing invocation of §1311 does not control
our interpretive inquiry. See *Adamo Wrecking Co.* v. *United States*,
434 U. S. 275, 283 (1978) (Congress "did not empower the Adminis-
trator . . . to make a regulation an 'emission standard' by his mere
designation").

*1316*, or 1345" (emphasis added)).  Section 1311(a) author-izes discharges that comply with those two cross-referenced sections.  See §1311(a) (prohibiting discharge of pollutants "[e]xcept as in compliance with . . . sections 1312, 1316 . . . ").  Thus, EPA actions under §§1312 and 1316 also would have a "legal and practical effect" on the scope of §1311's general prohibition of discharges, as the Government contends is the case with the WOTUS Rule. If, on the Government's reading, EPA actions under §§1312 and 1316 would count as actions "under section 1311" sufficient to trigger subparagraph (E), Congress would not have needed to cross-reference §§1312 and 1316 again in subparagraph (E).  That Congress did so under-cuts the Government's proposed "practical-effects" test.

Similarly, the Government's "practical-effects" test ignores Congress' decision to grant appellate courts exclu-sive jurisdiction only over seven enumerated types of EPA actions set forth in §1369(b)(1).  Section 1313, which gov-erns the EPA's approval and promulgation of state water-quality standards, is a prime example.  Approving or promulgating state water-quality standards under §1313 also has the "legal and practical effect" of requiring that effluent limitations be tailored to meet those standards. Under the Government's reading, subparagraph (E) would encompass EPA actions taken under §1313, even though such actions are nowhere listed in §1369(b)(1).  Courts are required to give effect to Congress' express inclusions and exclusions, not disregard them.  See *Russello* v. *United States*, 464 U. S. 16, 23 (1983) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally pre-sumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" (internal quotation marks and brackets omitted)).

Accordingly, subparagraph (E) does not confer original and exclusive jurisdiction on courts of appeals to review

the WOTUS Rule.

B

The Government fares no better under subparagraph (F). That provision grants courts of appeals exclusive and original jurisdiction to review any EPA action "in issuing or denying any permit under section 1342." §1369(b)(1)(F). As explained above, NPDES permits issued under §1342 "authoriz[e] the discharge of pollutants" into certain waters "in accordance with specified conditions." *Gwaltney of Smithfield, Ltd.* v. *Chesapeake Bay Foundation, Inc.*, 484 U. S. 49, 52 (1987). The WOTUS Rule neither issues nor denies a permit under the NPDES permitting program. Because the plain language of subparagraph (F) is "unambiguous," "our inquiry begins with the statutory text, and ends there as well." *BedRoc Limited, LLC* v. *United States*, 541 U. S. 176, 183 (2004) (plurality opinion).

Rather than confront that statutory text, the Government asks us to ignore it altogether. To that end, the Government urges us to apply the "functional interpretive approach" that it purports the Court employed in *Crown Simpson Pulp Co.* v. *Costle*, 445 U. S. 193 (1980) (*per curiam*). Brief for Federal Respondents 31. *Crown Simpson*, the Government says, broadens the statutory inquiry under subparagraph (F) by directing courts to ask whether agency actions are "'functionally similar'" to permit issuances or denials. Brief for Federal Respondents 33 (quoting *Crown Simpson*, 445 U. S., at 196). According to the Government, the WOTUS Rule is "functionally similar" to issuing or denying a permit because it establishes the geographical bounds of EPA's permitting authority and thereby dictates whether permits may or may not be issued. We reject this approach because it misconstrues *Crown Simpson* and ignores the statutory text.

First, *Crown Simpson* provides scant support for the

Government's atextual construction of subparagraph (F). In that case, the Court held that subparagraph (F) conferred jurisdiction over the EPA's veto of a state-issued permit. See 445 U. S., at 196. The Court explained that "[w]hen [the] EPA . . . objects to effluent limitations contained in a state-issued permit, the precise effect of its action is to 'den[y]' a permit within the meaning of [subparagraph F]." *Ibid.* Contrary to the Government's suggestion, the WOTUS Rule in no way resembles the EPA's veto of a state-issued permit addressed in *Crown Simpson.* Although the WOTUS Rule may define a jurisdictional prerequisite of the EPA's authority to issue or deny a permit, the Rule itself makes no decision whatsoever on individual permit applications. *Crown Simpson* is therefore inapposite.

In addition, the Government's proposed "functional interpretive approach" is completely unmoored from the statutory text. As explained above, subparagraph (F) applies only to EPA actions "issuing or denying" a permit "under section 1342." The Government invites us to broaden that narrow language to cover any agency action that dictates whether a permit is issued or denied. Congress easily could have drafted subparagraph (F) in that broad manner. Indeed, Congress could have said that subparagraph (F) covers EPA actions "relating to whether a permit is issued or denied," or, alternatively, EPA actions "establishing the boundaries of EPA's permitting authority." But Congress chose not to do so. The Court declines the Government's invitation to override Congress' considered choice by rewriting the words of the statute. See *Franklin Cal. Tax-Free Trust*, 579 U. S., at ___ (slip op., at 14).

Finally, the Government's interpretation of subparagraph (F) would create surplusage in other parts of §1369(b)(1). Subparagraph (D) is one example. That provision gives federal appellate courts original jurisdic-

tion to review EPA actions "making any determination as to a State permit program submitted under section 1342(b)." Put differently, subparagraph (D) establishes the boundaries of EPA's permitting authority vis-à-vis the States. Under the Government's functional interpretive approach, however, subparagraph (F) would already reach actions delineating the boundaries of EPA's permitting authority, thus rendering subparagraph (D) unnecessary. Absent clear evidence that Congress intended this surplusage, the Court rejects an interpretation of the statute that would render an entire subparagraph meaningless. As this Court has noted time and time again, the Court is "obliged to give effect, if possible, to every word Congress used." *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 339 (1979).

For these reasons, subparagraph (F) does not grant courts of appeals exclusive jurisdiction to review the WOTUS Rule in the first instance.

## III

### A

Unable to anchor its preferred reading in the statutory text, the Government seeks refuge in a litany of extratextual considerations that it believes support direct circuit-court review of the WOTUS Rule. Those considerations—alone and in combination—provide no basis to depart from the statute's plain language.

First, the Government contends that initial circuit-court review of the WOTUS Rule would avoid an irrational bifurcated judicial-review scheme under which federal courts of appeals would review individual actions issuing or denying permits, whereas district courts would review broader regulations governing those actions. In *E. I. du Pont de Nemours & Co.* v. *Train*, 430 U. S. 112 (1977), the Court described such a bifurcated regime as a "truly perverse situation." *Id.*, at 136. And a few years later, in *Crown Simpson*, the Court declared that "[a]bsent a far

clearer expression of congressional intent, we are unwilling to read the Act as creating such a seemingly irrational bifurcated system." 445 U. S., at 197. Unlike in *Crown Simpson*, however, here the Court perceives such a "clea[r] expression of congressional intent." *Ibid.* Even if the Court might draft the statute differently, Congress made clear that rules like the WOTUS Rule must be reviewed first in federal district courts. Moreover, the bifurcation that the Government bemoans is no more irrational than Congress' choice to assign challenges to NPDES permits to circuit courts, and challenges to §1344 permits to district courts. See 33 U. S. C. §1369(b)(1)(E). And notably, many of this Court's recent decisions regarding the agencies' application and definition of the term "waters of the United States" have originated in district courts, not the courts of appeals. See, *e.g.*, *Army Corps of Engineers* v. *Hawkes Co.*, 578 U. S. ___ (2016); *Sackett* v. *EPA*, 566 U. S. 120 (2012); *Rapanos*, 547 U. S., at 729 (plurality opinion).

Second, and relatedly, the Government argues that immediate court-of-appeals review facilitates quick and orderly resolution of disputes about the WOTUS Rule. We acknowledge that routing WOTUS Rule challenges directly to the courts of appeals may improve judicial efficiency. See *Crown Simpson*, 445 U. S., at 197 (noting that "the additional level of judicial review" that would occur in district courts "would likely cause delays in resolving disputes under the Act"); see also *Harrison* v. *PPG Industries, Inc.*, 446 U. S. 578, 593 (1980) ("The most obvious advantage of direct review by a court of appeals is the time saved compared to review by a district court, followed by a second review on appeal"). But efficiency was not Congress' only consideration. Had Congress wanted to prioritize efficiency, it could have authorized direct circuit-court review of all nationally applicable regulations, as it did under the Clean Air Act. See 42 U. S. C. §7607(b)(1) (granting the D. C. Circuit original jurisdiction to review

"any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter" and granting regional circuits jurisdiction to review "any other final action of the Administrator under this chapter . . . which is locally or regionally applicable"). That Congress structured judicial review under the Act differently confirms what the text makes clear—that §1369(b)(1) does not grant courts of appeals original jurisdiction to review many types of EPA action, including the WOTUS Rule.

Third, the Government contends that "initial review in a court of appeals" promotes "'[n]ational uniformity, an important goal in dealing with broad regulations.'" Brief for Federal Respondents 35 (quoting *National Resources Defense Council* v. *EPA*, 673 F. 2d 400, 405, n. 15 (CADC 1982) (R. B. Ginsburg, J.)). That argument carries some logical force. After all, the numerous challenges to the WOTUS Rule in this very case were consolidated in one Court of Appeals, avoiding any risk of conflict among other courts of appeals, whereas the same was not true for the challenges filed in district courts, leading to some conflicting outcomes. But even if Congress sought to ensure national uniformity, it did not pursue that end at all costs. Although §1369(b)(1) does not authorize immediate circuit-court review of all national rules under the Act, it does permit federal appellate courts to review directly certain effluent and other limitations and individual permit decisions. See, *e.g.*, §§1369(b)(1)(E), (F). It is true that Congress could have funneled all challenges to national rules to the courts of appeals, but it chose a different tack here: It carefully enumerated the seven categories of EPA action for which it wanted immediate circuit-court review and relegated the rest to the jurisdiction of the federal district courts.

Ultimately, the Government's policy arguments do not obscure what the statutory language makes clear: Sub-

paragraphs (E) and (F) do not grant courts of appeals exclusive jurisdiction to review the WOTUS Rule.

B

In a final effort to bolster its preferred reading of the Act, the Government invokes the presumption favoring court-of-appeals review of administrative action. According to the Government, when a direct-review provision like §1369(b)(1) exists, this Court "will not presume that Congress intended to depart from the sound policy of placing initial . . . review in the courts of appeals" "[a]bsent a firm indication that Congress intended to locate initial APA review of agency action in the district courts." *Florida Power & Light Co.* v. *Lorion*, 470 U. S. 729, 745 (1985). But the Government's reliance on *Florida Power* is misplaced. Unlike the "ambiguous" judicial review provisions at issue in *Florida Power*, *id.*, at 737, the scope of subparagraphs (E) and (F) is set forth clearly in the statute. As the Court recognized in *Florida Power*, jurisdiction is "governed by the intent of Congress and not by any views we may have about sound policy." *Id.*, at 746. Here, Congress' intent is clear from the statutory text.[9]

IV

For the foregoing reasons, we reverse the judgment of the Court of Appeals and remand the case with instructions to dismiss the petitions for review for lack of jurisdiction.

*It is so ordered.*

---

[9] Although the parties paint dueling portraits of the legislative history, the murky waters of the Congressional Record do not provide helpful guidance in illuminating Congress' intent in this case. Even for "[t]hose of us who make use of legislative history," "ambiguous legislative history" cannot trump "clear statutory language." *Milner* v. *Department of Navy*, 562 U. S. 562, 572 (2011). Just so here.