NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0024n.06

Case No. 19-1405

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Jan 15, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| TRENT SHERMAN, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| MICHIGAN DEPARTMENT OF NATURAL | ) | DISTRICT OF MICHIGAN |
| RESOURCES, et al., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

**O P I N I O N**

BEFORE: GILMAN, McKEAGUE, and KETHLEDGE, Circuit Judges.

**McKEAGUE, Circuit Judge.** Shining (also called spotlighting or jacklighting) is when one casts light into a field or forest to spot game. Many deer hunters think shining at night to hunt is unsportsmanlike. Anyone who's encountered deer on an evening drive can understand why: deer freeze in headlights, making them easy targets. But nighttime shining is problematic for other reasons. It facilitates poaching, for one. With the benefit of headlights and flashlights, hunters can snipe from their cars along the roadside into land that isn't theirs. And it can be dangerous. A hunter might not realize that a home lies just beyond the deer he's shining and about to shoot. So some states, including Michigan, limit shining to the daytime and outright ban shining while hunting.

Michigan's Department of Natural Resources and its conservation officers enforce shining laws and other laws to protect the state's parks, forests, and recreation areas—which is what led to this case. Late one October night in 2015, a Department airplane pilot on patrol over rural Alpena County spotted a truck shining on a road on private land in Green Township. That land is called Fleco Camp. The landowner had previously given conservation officer Webster a key to the padlocked gate at the camp's entrance so that the Department could catch poachers.

Conservation officers Webster and Lynch rushed to Fleco Camp to investigate the pilot's report. Arriving within twenty minutes of the reported shining, they opened the gate using the landowner's key and found Trent Sherman and his friend, guests of the landowner, standing outside a cabin at the camp. Sherman's truck was parked there, too. Lynch asked the pair what they were doing: the friend said they were checking traps using Sherman's truck, which Sherman was driving; Sherman instead replied they were "out shining for deer," just about where the pilot spotted them. Lynch asked if he could search the truck. Sherman agreed and admitted that there was a gun inside when asked. Sure enough, Lynch found a loaded Ruger pistol in its case on the floor of the truck's cab.

All the while, Webster and Lynch noticed Sherman slurring his words and smelled alcohol on his breath. So they had Sherman "do the walk and turn and one leg stand"—that is, a sobriety test. Sherman gave up on the one leg stand: "[I'm] done and [I] can't do this." Lynch asked Sherman if he would take a breath test, but he refused. The two then went in the cabin while Webster waited outside. Apparently, Sherman was trying to contact a lawyer. After emerging from the cabin about forty-five minutes later, Lynch arrested Sherman for drunk driving, possessing a gun while drunk, possessing a loaded gun in a vehicle, and shining while possessing

a gun. When Sherman submitted to a breath test three hours later, he blew a blood alcohol level of .11—above the .08 limit under Michigan law for both driving and possessing a gun.

Ultimately, Alpena County prosecutors charged Sherman with only three offenses: (1) shining while possessing a gun, under Mich. Comp. Laws § 324.40113(1); (2) possessing a gun while drunk, under *id.* § 750.237(1); and (3) shining after 11 p.m., under *id.* § 324.40113(2). After holding a hearing, the state court dismissed the first two charges because Sherman didn't "possess" the Ruger in his truck, but left the third charge standing. Prosecutors dropped the third charge as a waste of resources after Sherman promised not to violate the law again.

These are the facts drawn from Sherman's complaint and its exhibits, and we assume that they're true. *See Rondigo, L.L.C. v. Twp. of Richmond*, 641 F.3d 673, 676 n.1 (6th Cir. 2011). They show, according to Sherman, that his constitutional rights were violated in the following ways: Webster and Lynch had no right to arrest and jail him; the Department knew that Webster and Lynch would violate Sherman's rights, yet it did nothing; in fact, Webster, Lynch, and the Department *conspired* to violate Sherman's rights; and they maliciously prosecuted him, too. The district court disagreed with Sherman and dismissed his complaint. Sherman asks us to reverse.

In order to reverse, we'd have to find that Sherman plausibly alleged at least one claim for relief; that, on these facts, some defendant wronged him. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Keeping in mind that we review Sherman's allegations de novo, *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006), we conclude that the district court correctly shot down Sherman's whole complaint.

Start with Webster and Lynch. Sherman says their warrantless entry into Fleco Camp violated the Fourth Amendment. But the landowner gave Webster a key to the camp's main gate so that the Department could catch poachers. This consent to search means that Webster and

Lynch needed "neither a warrant nor probable cause" to drive by and see what Sherman and his friend were up to. *United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996). The pilot's shining report gave them probable cause to search the area anyway, with or without the key. Neither Michigan law nor federal law prevents officers from jumping fences to search rural hunting grounds on reliable reports of illegal activity. *See* Mich. Comp. Laws § 324.1602(1); *see also Spann v. Carter*, 648 F. App'x 586, 588 (6th Cir. 2016) (citing *Oliver v. United States*, 446 U.S. 170, 174, 180 (1984)); *United States v. Burton*, 894 F.2d 188, 190–91 (6th Cir. 1990). And sure, Sherman and Lynch went into the cabin for a while, but that's all Sherman alleged. From that we can't plausibly infer that Lynch barged in or overstayed his welcome. So Webster and Lynch didn't violate Sherman's Fourth Amendment rights by entering the camp or the cabin.

Then there's the arrest, which Sherman says also violated his Fourth Amendment rights. Sherman argues that drunk driving was the only charge that Lynch could have arrested him for without a warrant, *see* Mich. Comp. Laws §§ 764.15(1)(d) and 257.625(9)(a)(ii), but there was no probable cause for an arrest. Sherman might've downed alcohol in the twenty minutes it took Webster and Lynch to get to Fleco Camp, for instance. And Sherman wasn't driving that night, even though his friend said so.

That's not how probable cause works. We look at the "totality of the circumstances" that the arresting officer was confronting—"the whole picture." *United States v. Cortez*, 449 U.S. 411, 417 (1981). Lynch understood that there was a truck illegally shining on a road at Fleco Camp. When he arrived at the camp twenty minutes later, he encountered a noticeably drunk Sherman, who admitted to shining, and who his friend said was driving. That's enough for probable cause, which "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *United States v. Tagg*, 886 F.3d 579, 585 (6th Cir. 2018) (quoting *District of*

*Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)). Sherman's innocent, post-hoc explanations don't change that. *Wesby*, 138 S. Ct. at 588 ("[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts."). And despite what Sherman suggests, drunk driving is illegal even at Fleco Camp—the drunk driving law reaches all places "generally accessible to motor vehicles," including fenced-in, private roads. *United States v. Graef*, 31 F.3d 362, 363–64 (6th Cir. 1994) (quoting Mich. Comp. Laws § 257.625(1)). Lynch thus had probable cause to arrest Sherman for drunk driving, so there was no Fourth Amendment violation.

Next, there's Sherman's conspiracy claim, brought under 42 U.S.C. § 1985(3), and his malicious-prosecution claim. The conspiracy claim misses the mark because Sherman failed to plead one of its elements: he never alleged any defendant was motivated by "racial, or other class-based, invidiously discriminatory animus." *Bass v. Robinson*, 167 F.3d 1041, 1050 (6th Cir. 1999). And as for malicious prosecution, the facts as alleged by Sherman show that there was probable cause to prosecute him for shining after 11 p.m. Namely, a Department pilot spotted a truck shining after 11 p.m., right where Sherman admitted to Lynch that he had been shining. Probable cause to prosecute necessarily defeats a malicious-prosecution claim. *See Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010).

Which leaves the Department for last. Sherman lodges claims against the Department and its officers acting in their official capacities (officials, for short), but they're immune from suit under the Eleventh Amendment. As Sherman's complaint recognizes, the Department is a "division" or "agency" of Michigan. Although a state's municipalities are persons subject to suit under 42 U.S.C. § 1983, the state itself, its departments, and its officials are not. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989). Nor can *Ex parte Young*, 209 U.S. 123 (1908), save Sherman. That exception to sovereign immunity applies only if the "complaint alleges an

ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring in part and concurring in the judgment)).  Sherman alleged no violations of his rights in the past, let alone ongoing ones.  His complaint's factual allegations stop in 2017.  Sovereign immunity thus bars Sherman's claims against the Department and its officials.

The district court was right to dismiss Sherman's complaint, so we **AFFIRM**.