RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0071p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

        *Plaintiff-Appellant*,

    *v.*

No. 12-5997

CHARLES ARTHUR KINISON, JR.,

        *Defendant-Appellee*.

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:12-cr-00057—Karl S. Forester, District Judge.

Decided and Filed: March 19, 2013

Before: MARTIN, GUY, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

_____

**ON BRIEF:** Charles P. Wisdom, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, Jason A. Denney, UNITED STATES ATTORNEY'S OFFICE, Ft. Mitchell, Kentucky, for Appellant. Rachel D. Yavelak, ANGGELIS & GORDON, PLLC, Lexington, Kentucky, for Appellee.

_____

## OPINION

_____

McKEAGUE, Circuit Judge. Charles Kinison Jr. was indicted for receiving and possessing child pornography in violation of 18 U.S.C. § 2252(a)(2) and § 2252(a)(4)(B) after a search of his home turned up over 300 images and 40 videos of child pornography. The district court granted Kinison's motion to suppress this evidence on the ground that the magistrate did not have a substantial basis for concluding that the search would uncover evidence of wrongdoing. The court also concluded that police could not have had an objectively reasonable good faith belief that the magistrate's

probable cause determination was proper. The government appealed. For the following reasons, we reverse.

**I.**

On August 9, 2011, Lauren Omstott told the Lexington, Kentucky police that she believed her boyfriend, Charles Kinison, was potentially involved in criminal sexual activity with children. Omstott initially spoke with Detective David Flannery. Detective Flannery sought assistance in the investigation from Special Agent Kimberly Kidd with the Federal Bureau of Investigations. On August 11, 2011, Agent Kidd interviewed Omstott. Omstott stated that Kinison had been sending her disturbing text messages, and that the messages detailed his desire to get them both involved with a group in Savannah, Georgia that allegedly adopts children and then allows people in the group to engage in sex with those children. Agent Kidd directed Omstott to the Lexington computer forensics unit in order to extract the text messages from her phone.

On August 12, 2011, Omstott met with Detective Jim Barber and consented to Barber's search of Omstott's phone. Barber downloaded 1,646 pages of text messages. Ultimately, several pages of excerpts from the messages, along with a disc containing the entirety of the messages, were included in the warrant affidavit. The extracted messages corroborated Omstott's claims as to their content.[1]

Kinison's messages stated that he saw pictures of one of the adults in the Savannah group performing oral sex on a four-year-old boy. Kinison also stated his desire that he and Omstott, who he referred to numerous times in the messages as "Babe," join the group. Omstott replied in several messages that she would be interested in joining the group, wanted to know when they would be going to Savannah, and stated that not joining would be "like canceling Christmas!" Kinison instructed her that "[t]he new family must truely [sic] want to join . . .," and that prior to joining the group, they would have to be approved by providing "evidence of [their] sincerity" by taking

---

[1]After the search of his home, Kinison admitted in a post-*Miranda* statement that he authored and sent the text messages. R. 12, Detention Order, at 32.

pictures of themselves having a sexual encounter with a child. Kinison suggested that they could babysit a child under two-years-old that would not be able to talk so that they could perform sexual acts on the child and take photos and videos to send to the group. Kinison also stated that he "found a web site with naked kid pics," and "[f]ound some pics of a 5 yr old girl getting f–ked." Omstott replied, "How did you find a site with that?" Kinison answered, "Just surfing. It's a video clip."

Two weeks later, on August 25, 2011, Agent Kidd again interviewed Omstott. She asked Omstott where Kinison was viewing the child pornography described in his texts to her. Omstott claimed Kinison was viewing the videos on his home computer. Detective Flannery showed Omstott a photo of Kinison, and she verified that he was the one that sent her the text messages from the phone number she identified to Agent Kidd. Flannery also conducted a records check on Kinison and verified his address.

On August 31, 2011, based on the information outlined above, Detective Flannery sought and received a warrant to search Kinison's house. On September 1, 2011, Flannery and at least ten other officers, executed the warrant. While they were executing the warrant, Kinison arrived in his car. Officers saw Kinison's cell phone in plain view in the middle of the vehicle's console. Detective Flannery then sought and received a search warrant for the car based on his prior affidavit and the plain view of Kinison's phone. Officers seized a computer and a cell phone from Kinison's house and the phone from his car. A forensic examination of Kinison's computer revealed over 300 images and 40 videos of child pornography. He was arrested and later indicted for receiving and possessing child pornography in violation of 18 U.S.C. § 2252(a)(2) and § 2252(a)(4)(B).

Kinison moved to suppress the evidence seized during the search. He argued that the warrant affidavit submitted by Detective Flannery failed to establish probable cause to search Kinison's house and car, and that the police could not have acted with an objectively reasonable good faith belief that the magistrate's determination was proper. The district court granted Kinison's motion. The government appealed that decision. We now reverse.

**II.**

In reviewing a district court's decision to grant a motion to suppress, findings of fact are reviewed for clear error, and conclusions of law are reviewed de novo. *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009). Importantly, however, "when judging the sufficiency of an affidavit to establish probable cause in support of a search warrant, the Supreme Court has 'repeatedly said that after-the-fact scrutiny . . . should not take the form of *de novo* review.' Rather, reviewing courts are to accord the magistrate's determination 'great deference,'" *United States v. Terry*, 522 F.3d 645, 647 (6th Cir. 2008) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (quotations and alterations omitted))*,* and should avoid "line-by-line scrutiny [of the underlying affidavit] . . . ." *Gates*, 462 U.S. at 246 n.14. Thus, "'[s]o long as the magistrate had a substantial basis for . . . conclud[ing] that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Gates*, 462 U.S. at 236 (quotations omitted)). We have "long held that an issuing magistrate's discretion should only be reversed if it was arbitrarily exercised." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000).

**III.**

In this appeal, we address whether Detective Flannery's affidavit provided the magistrate with a substantial basis for concluding the search here would uncover evidence of wrongdoing. We also assess whether, absent a substantial basis for the magistrate's decision, the officers nevertheless acted on an objectively reasonable good faith belief that the magistrate's determination was proper. We take each issue in turn.

**A.**

The Supreme Court has recently reaffirmed that the test for probable cause is not reducible to "'precise definition or quantification.'" *Florida v. Harris*, —S. Ct.—, 2013 WL 598440, slip op. at 5 (Feb. 19, 2013) (quoting *Maryland v. Pringle*, 540 U. S. 366, 371 (2003)). And that "'[f]inely tuned  standards . . . have no place in the [probable-cause] decision.'" *Id.* (quoting *Gates*, 462 U. S. at 235). Accordingly, the Court has "consistently looked to the totality of the circumstances" to determine

"whether the State has met this practical and common-sensical standard," and has "rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach." *Id.*

Under this standard, when presented with a warrant application, a magistrate judge must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. While the supporting affidavit must contain adequate facts about the underlying circumstances to show that probable cause exists, "[t]hese supporting facts need not be based on the direct knowledge and observations of the affiant, but may also come from hearsay information." *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir.1996) (citing *Jones v. United States*, 362 U.S. 257, 269–70 (1960)). Further, an "affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added." *Allen*, 211 F.3d at 975.

Against the advice in *Allen*, the district court here concluded that Omstott's statement to police was insufficient and that police should have corroborated several additional details in order for her statement to be credible and the affidavit to be sufficient. But we have clearly held that a known informant's statement can support probable cause even though the affidavit fails to provide any additional basis for the known informant's credibility and the informant has never provided information to the police in the past. *United States v. Miller*, 314 F.3d 265, 270 (6th Cir. 2002). ("The simple fact is that the informant, Haas, was named in the affidavit in question. Sheriff Fee spoke to Haas on two occasions over the telephone. Shortly after one of those calls, Sheriff Fee and Haas drove together to the location of Miller's mobile home . . . . Moreover, with Haas's identity secured, Haas himself was subject to prosecution if this information was fabricated.").

As we noted in *Miller*, this conclusion is even clearer when the known informant's decision to go to police has also subjected her to potential prosecution. *See United States v. Couch*, 367 F.3d 557, 560 (6th Cir. 2004) (explaining that an

informant is more credible where the information contained in the affidavit supporting probable cause was not that of an "uncorroborated tip of an unknown informant," but rather, was from an informant whose identity was "known to the officers and . . . named in the affidavit," and where the informant was subject to prosecution).

In this case, Omstott's identity was clearly known to Detective Flannery and Agent Kidd because she met with them in person on at least three different occasions. Further, not only was Omstott potentially subject to prosecution for making false statements had she lied to police, as in *Miller* and *Couch*, 314 F.3d at 270; 367 F.3d at 560, but by revealing through the text messages her agreement to participate in the child sex acts, she was subjecting herself to serious potential criminal prosecution under 18 U.S.C. § 2251(a) & (e) (criminalizing agreement to produce and production of child pornography). In *United States v. Harris*, 403 U.S. 573, 583 (1971), a plurality of the Supreme Court explained that "[p]eople do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime, . . . carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search." *Id.*

Accordingly, the district court erred in concluding that the police here were required to conduct further investigation in order to verify Omstott's veracity and reliability, or to corroborate other aspects of her statements regarding her relationship with Kinison, *i.e.*, that the phone number was Kinison's or that Omstott was his girlfriend. The police extracted 1,646 pages of text messages; several of them refer to Omstott as "babe;" the messages make plans to travel together, engage in sexual acts together, and commit a heinous crime together. Given Omstott's credibility as a named informant along with the decidedly intimate relationship evident in the text messages, the affidavit did not need to delineate all of the extra details the district court required. *See Allen*, 211 F.3d at 975 ("Affidavits are not required to use magic words, nor does what is obvious in context need to be spelled out.").

The district court also erred in concluding there was no nexus here between the alleged evidence (child pornography on computers or phones) and the place to be

searched (Kinison's house and car). We agree that to establish probable cause to support a search warrant, there must be some nexus between the suspected illegal activity and the property to be searched. *See United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006). But that requirement is satisfied here.

In our prior cases challenging probable cause to search a home for child pornography, we have found that probable cause existed where a government investigation revealed the individual had a subscription or expired subscription to a website known to contain child pornography, *United States v. Frechette*, 583 F.3d 374, 379 (6th Cir. 2009); *United States v. Wagers*, 452 F.3d 534, 538-39 (6th Cir. 2006), and where an Internet Protocol address connected the subscriber to a location. *Frechette*, 583 F.3d at 377; *Wagers*, 452 F.3d at 540. But we have also held that an IP address connecting the subscriber to a particular location is not dispositive, and found probable cause to search a home even though the affidavit did not contain direct evidence the child pornography was accessed at home, and only established the individual had at some point forwarded an email containing child pornography. *Terry*, 522 F.3d at 648. While each of these cases, to some degree, relied on a piece of data (for example an IP address or a link between an email address and a provider) linking the individual to a computer, *none* of the aforementioned cases involved, as this case does, a credible known informant who was also the suspect's girlfriend, and who turned over evidence to police that inculpated both of them in a serious crime.

It makes sense under the flexible, common-sense approach to probable cause determinations, that where police have no "inside scoop," they would rely on other peripheral data, *i.e.* an IP address or email provider, to connect an alleged crime with a place to be searched. But in this case, two weeks after providing police with her initial statement and allowing police to forensically extract evidence from her phone, Omstott herself told Agent Kidd that Kinison viewed the videos of child pornography on his home computer.

The fact that Kinison would be viewing the child pornography at home is completely consistent with our prior observations that child pornography crimes are

"generally carried out in the secrecy of the home." *United States v. Paull*, 551 F.3d 516, 522 (6th Cir. 2009); *see also Wagers*, 452 F.3d at 540 (stating that viewing child pornography is "much more tied to a place of privacy" and "seclusion"); *United States v. Hampton*, 2012 WL 5382946, at \*2 (6th Cir. Nov. 5, 2012) (stating that "[c]ollectors of child pornography . . . rarely if ever dispose of such material, and store it for long periods in a secure place, typically in their homes.") (internal quotation marks omitted).

Here, the clear language of the text messages along with Omstott's statement are sufficient to establish the required nexus to Kinison's home and a substantial basis for the magistrate's determination. The messages establish that Kinison wanted to join a group that sexually exploited children, and that to prove his "sincerity" to that group, he desperately wanted the couple to "babysit" a 2-year-old boy so they could sexually assault the child while photographing and videotaping the encounter. The messages also unmistakably state that Kinison "found a web site with naked kid pics," "[f]ound some pics of a 5 yr old girl getting f–ked," and that he did so by "Just surfing." When considered alongside: 1) Omstott's credibility as a named informant who inculpated herself in a serious crime and provided police with evidence of that crime; 2) the clearly intimate nature of the parties' relationship evident from the text messages; 3) Omstott's statement that Kinison viewed the images in his home; 4) our prior acknowledgment that child pornography crimes are private in nature and generally carried out in the home; 5) the officers' corroboration of Kinison's identity with Omstott; and 6) the officers' verification of Kinison's address, we conclude that the magistrate had a "substantial basis" to reach the "practical, common-sense" conclusion that there was a "fair probability that contraband or evidence of" child pornography would be found in Kinison's home. *Gates*, 462 U.S. at 238.

Moreover, because the text messages in the affidavit indicating the couple's desire to view, exchange, and participate in child pornography in violation of the law were sent from a phone, the magistrate had a substantial basis for concluding that there was a "fair probability that contraband or evidence of" child pornography would be

found in Kinison's car after police saw a cell phone in plain view on the console.  The district court erred by concluding otherwise as to both warrants.

**B.**

Even if we were to conclude that the magistrate's decision was "arbitrarily exercised," *Gates*, 462 U.S. at 648, the police conduct here does not justify the "heavy toll" generated by excluding the evidence in this case. *Davis v. United States*, 131 S. Ct. 2419, 2427 (2011).

In *Davis*, the Supreme Court made clear that the "sole purpose" of the exclusionary rule "is to deter further Fourth Amendment violations." *Id.* at 2426 (citing *Herring v. United States*, 555 U.S. 135, 141 (2009)).  Additionally, the rule must be used as a "last resort," *Hudson v. Michigan*, 547 U.S. 586, 596 (2006), and only when "the deterrence benefits of suppression . . . outweigh its heavy costs." *Davis*, 131 S. Ct. at 2427.

In *Davis*, the Court also noted that beginning with *United States v. Leon*, 468 U.S. 897 (1984), the "cost-benefit analysis" was "recalibrated . . . to focus the inquiry on the 'flagrancy of the police misconduct' at issue." 131 S. Ct. at 2427 (quoting *Leon*, 468 U.S. at 909).  Now, only police conduct that evidences a "deliberate, reckless, or grossly negligent" disregard for Fourth Amendment rights may "outweigh the resulting costs." *Id.* (quoting *Herring*, 555 U.S. at 144).  By contrast, where police act with an "objectively reasonable good-faith belief," or where their actions involve only simple "isolated" negligence, "exclusion cannot 'pay its way.'" *Id.* at 2427-28 (quoting *Leon*, 468 U.S. at 907 n.6) (quotations and citations omitted).

A conclusion that the officer did not act with "objectively reasonable good-faith" can now only be supported in one of four instances. *See United States v. Hodson*, 543 F.3d 286, 292 (6th Cir. 2008).  The only one relevant for our purposes is whether the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923.  In conducting this inquiry, we look to whether the executing officers "reasonably believed that the warrant was

properly issued, *not* whether probable cause existed in fact." *United States v. Laughton*, 409 F.3d 744, 752 (6th Cir. 2005) (quotations omitted).  Whether the warrant was later held to be invalid is an error that "rests with the issuing magistrate, not the police officer, and punishing the errors of judges is not the office of the exclusionary rule." *Davis*, 131 S. Ct. at 2428.

In this case, there is simply no police conduct that evidences a "deliberate, reckless, or grossly negligent" disregard for Kinison's Fourth Amendment rights. Detective Flannery and Agent Kidd spent a few weeks gathering information.  They each interviewed Omstott, they extracted evidence from her phone that corroborated her story, they sorted and compiled the thousands of text messages that may have been relevant, and they verified Kinison's identity and address.  They then presented that information to a magistrate who found it sufficient to support probable cause.  The magistrate could have concluded that the affidavit was insufficient and sent it back to the officers for further investigation.  But that did not happen.

Once the warrant was issued, the officers had no reason to suspect the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," *Leon*, 468 U.S. at 923, and thus that the warrant was not "properly issued." *Laughton*, 409 F.3d at 752.  It did not matter at that point whether in fact there actually was probable cause. *Id.*  The affidavit clearly alleged that Kinison was engaging in child sex and child pornography crimes, and that he was communicating about those crimes with others.  It accordingly requested to search for communication and technology devices that would allow him to carry out those crimes, including computers, phones, storage devices, and any hard copies of electronic materials.

This is therefore not a case like *Hodson* where we concluded the good faith exception did not apply because the crime alleged (child molestation) bore little or no connection to the search request (computers for evidence of child pornography). 543 F.3d at 288-89.  This is also not a case like *Laughton* where the "bare bones" affidavit simply "listed the address of the premises to be searched, a summary of the deputy's professional experience, and two acontextual allegations against Laughton."

409 F.3d at 751.  In fact, we distinguished the facts in *Laughton* from several of our other cases involving the good faith exception and a lack of nexus to the place to be searched on the basis that in those other cases the exception was available because "the issuing magistrate—as well as the reviewing court—was able to identify  . . . in the affidavit *some* connection, regardless of how remote it may have been, between the criminal activity at issue and the place to be searched." *Id.* at 749-50 (collecting cases).

In this case, that connection was supplied by the text messages stating that Kinison was viewing child pornography on the internet, and Omstott's subsequent averment that Kinison was viewing child pornography on his home computer.  In *Carpenter*, we stated that even though an affidavit may fail to provide a substantial basis supporting *probable cause* because it did not provide a sufficient nexus between the residence and illegal activity, the good faith exception could still apply so long as the affidavit was  not "completely devoid of any nexus" between the residence and activity. *United States v. Carpenter*, 360 F.3d 591, 595-96 (6th Cir. 2004) (en banc).  The affidavit here is not "completely devoid of any nexus" between Kinison's home and the child pornography allegations.  Accordingly, the district court erred by concluding that officers here acted unreasonably by relying on the magistrate's determination.

The district court also concluded that the good faith exception is not available here because the objective reasonableness test "cannot apply . . . [where] there was no such objective officer, as Flannery was both the affiant and the officer who executed the warrant." *United States v. Kinison*, 2012 WL 3583538, at *3 (E.D. Ky. August 20, 2012) (citing *Hodson*, 543 F.3d at 292 and *Groh v. Ramirez*, 540 U.S. 551 (2004)).  But the cases cited by the district court do not support this broad proposition.

In *Hodson*, where the crime alleged bore no connection to the evidence sought, our concern was whether an executing officer's subjective knowledge can be sufficient to satisfy a finding of objective good faith.  We held that it was not.  543 F.3d at 293. This same concern in part motivated the Supreme Court in *Groh* where the plaintiff filed a *Bivens* action against law enforcement after they searched his house based on a warrant that completely failed to describe the items to be seized.  540 U.S. at 564.  The Court

said the warrant was invalid.  It further explained that the officer who executed the warrant would not be able to rely on qualified immunity because the warrant plainly did not comply with the Constitution, and because the officer himself prepared the invalid warrant and therefore could not have reasonably relied on the magistrate's determination.  *Id.*   Neither *Hodson* nor *Groh* apply in this case.

Unlike in *Hodson*, here, the government is not relying on any subjective knowledge that Detective Flannery or any of the other officers at the search may have had about the underlying facts.  As discussed above, the four-corners of the affidavit here supplied a substantial basis for the magistrate's decision, *Laughton*, 409 F.3d at 751, and the government here also relies solely on the affidavit to establish the nexus between the allegations and the place to be searched.  Further, while Detective Flannery may have prepared the affidavit, it is not clear, and the district court did not make such a finding, that he also drafted the warrant.   Even assuming he prepared the warrant, it was not deficient on its face like the warrant in *Groh*.  And in any event, concluding that Detective Flannery and the ten other officers conducting the search could not reasonably rely on the magistrate's determination in this case would undermine the principle that police officers are entitled to rely on such a determination.  *See Leon*, 468 U.S. at 922-23 (stating the question is "whether a reasonably well trained officer would have known the search was illegal despite the magistrate's authorization."); *see also McPhearson*, 469 F.3d at 525 (same).

Moreover, we soundly rejected the district court's interpretation of *Hodson* and *Groh* in *United States v. Hollin*, 459 F. App'x 535, 539 (6th Cir. 2012).  In *Hollin*, as here, the defendant contended the good faith exception did not apply because the affiant for the warrant also executed it.  *Id.*  We rejected that argument and distinguished *Hodson* and *Groh* on the basis that both of those cases "involved a disconnect between the probable cause provided in the affidavit and the items to be searched."  *Id.* at 540. We declared it was not unreasonable for officers to rely on the affidavit because the affidavit connected the alleged crime (drug trafficking) with the place to be searched (drugs viewed in the apartment).  *Id.*  In this case too, the affidavit set forth a connection

between the alleged activity and the place to be searched, and was not "completely devoid of any nexus." *Carpenter*, 360 F.3d at 595-96. Accordingly, it was not unreasonable for officers to rely on the magistrate's determination even though the affiant here was also the executing officer.

In sum, there was simply no culpable police conduct to deter here. And the "absence of police culpability dooms [a] claim" that evidence should be excluded. *Davis*, 131 S. Ct. at 2428. "[T]he harsh sanction of exclusion 'should not be applied to deter objectively reasonable law enforcement activity.'" *Id.* at 2429 (quoting *Leon*, 468 U.S. at 919).

**IV.**

For the foregoing reasons we **REVERSE** the district court's decision granting Kinison's motion to suppress and **REMAND** for further proceedings.