NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0080n.06

No. 22-2141

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED

Feb 23, 2024

KELLY L. STEPHENS, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff-Appellant, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| BRETT DAUPHINAIS, | ) |
| Defendant-Appellee. | ) |
| | ) |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

OPINION

Before: WHITE, STRANCH, and NALBANDIAN, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** In October 2021, Brett Dauphinais ordered a tableting press, a regulated device, for delivery to a residential address, triggering a Drug Enforcement Agency (DEA) investigation. Agents then monitored the delivery address, as well as a second address to which Dauphinais transported the tableting machine immediately after its delivery. Based on the lengthy affidavit of an experienced agent, the DEA sought a search warrant for the second address, which was granted, resulting in seizure of some controlled substances, drug paraphernalia, and two firearms. The Government indicted Dauphinais on drug and firearm-related charges. The district court granted Dauphinais's motion to suppress the evidence, determining that the warrant affidavit failed to establish probable cause to search and that the good faith exception to the exclusionary rule did not apply to the evidence obtained under the warrant. The Government appeals both determinations. We **AFFIRM** the district court's holding that the

warrant lacked probable cause but **REVERSE** its determination that the good faith exception did not apply and **REMAND** for further proceedings.

## I.    BACKGROUND

### A.    Factual Background

The facts of this case are undisputed.  On October 20, 2021, Brett Dauphinais ordered a tableting machine, a device that retails for thousands of dollars and allows the user to make food or drug tablets.  Tableting machines can be used to make counterfeit pills containing fentanyl. Federal law regulates the sale of these machines, *see* 21 C.F.R. § 1310.05(b)(2), and the seller required Dauphinais to provide a reason for the purchase.  When prompted, Dauphinais indicated that he intended to use the tableting machine to conduct research and development "with sugar tablets and different superfood tablets," including "Bee Pollen, Reishi, monk fruit and goji berry tablets."  Along with the tableting machine, Dauphinais also purchased a blue binding agent, a punch die-modified ball, oil used to absorb tableting powder, and sucrose.  Dauphinais entered a mailing address associated with a residential property in Royal Oak, Michigan, a phone number, and his email at the time of sale.

On November 2, DEA investigators were notified of this "suspicious transaction" because private individuals do not typically purchase tableting machines and Dauphinais's residential address triggered the DEA's notification system.  The next day, investigators issued a subpoena to the tableting machine seller requesting information about the sale; the seller complied the same day.  This enabled investigators to learn Dauphinais's name, address, contact information, the other products he purchased from the seller along with the tableting machine, and the reason he provided for buying the machine.  Using this information, investigators learned that Dauphinais was registered as the organizer and resident agent of DFM Holdings, a domestic limited liability

company registered with the Michigan Department of Licensing and Regulatory Affairs. Investigators also discovered that Dauphinais listed the Royal Oak residence as the address on his driver's license. Google searches for DFM Holdings and the Royal Oak address failed to return any results related to business or sales.

Investigators surveilled the Royal Oak residence beginning at 9 a.m. on November 8, 2021. There, they observed the delivery of a washing machine, and watched a woman exit the residence for a brief walk. Investigators concluded their surveillance at approximately 2 p.m. At no point did they observe Dauphinais at the residence.

Surveillance resumed at 9 a.m. the next day. Around 11:47 a.m., investigators observed a woman, later identified as Dauphinais's mother, arrive at the Royal Oak residence and enter through the backdoor. About five minutes later, Dauphinais's mother exited the residence with "an older white female with an oxygen mask," escorted the older woman to the car, and drove the pair away. During the surveillance period, investigators conducted a trash pull, which revealed a variety of empty packages addressed to the women observed at the Royal Oak residence. The trash pull did not reveal anything addressed to Dauphinais or DFM Holdings. Investigators concluded their surveillance around 2:15 p.m.

After confirming the date and time of the tableting machine's delivery with FedEx, investigators stationed themselves outside the Royal Oak residence around 9 a.m. on November 10. Around 11:30 a.m., a FedEx truck pulled up to the residence, and while the truck parked, a car, in which Dauphinais was the passenger, arrived. Subsequent research by investigators revealed that Dauphinais had two alcohol-related offenses and that his license to drive was restricted. After the FedEx driver unloaded the crate containing the tableting machine into the

driveway, Dauphinais and the driver of the vehicle he arrived in loaded the package into the vehicle and drove away from the Royal Oak residence to a house in Ferndale, Michigan.

Approximately 20 minutes later, investigators observed Dauphinais and his companion arrive at a residence in Ferndale, Michigan. Investigators did not observe Dauphinais and his companion transport the tableting machine from the car into the Ferndale residence; however, based on observations regarding the opening and closing of the vehicle's trunk, the investigators believed that Dauphinais and his companion moved the tableting machine into the Ferndale residence via the backdoor. Around 12:13 p.m., investigators saw Dauphinais and his companion drive to a third location, where they entered the residence and emerged with "a heavy, large, black rectangle box or tabletop" while accompanied by "[a]n unidentified white male," and Dauphinais and his driving companion then returned to the Ferndale residence. Dauphinais's mother arrived at the Ferndale residence around 1:19 p.m., where officers observed her pick up mail from the front entrance, move some sticks around the yard, and then go for a walk around the street with an unidentified woman. Dauphinais's driving companion left the Ferndale residence around 1:41 p.m., and investigators continued surveilling the Ferndale residence until 3:15 p.m.

On November 12, law enforcement applied for a search warrant, supporting it with a sealed affidavit containing the observations described above. The affiant provided her background and experience, stating that she had served as a "DEA Special Agent since January 2018," that she had been licensed as an attorney in Michigan "since July 2009," and that she "received specialized training in narcotics investigations and identification, as well as the laws of search and seizure." The affiant then outlined the information discussed above and stated that investigations of "similar suspicious orders of tableting machines as recently as June 2021 . . . resulted in the discovery of

illegal pill-press operations." Specifically, the affiant identified "the following similarities between those cases" and her observations of Dauphinais:

- the order for the tableting machine was processed through [the seller];
- the purchaser's listed intended use of the tableting machine was for a residence allegedly related to a business;
- the order was shipped to a residential address, rather than a business address;
- and the order was shipped to one residential address and moved to another residential address.

The affiant also noted that drug dealers often manufacture counterfeit pills containing "fentanyl analogues" to realize profitable illegal drug enterprises, and that the materials Dauphinais ordered with the tableting machine "could be used to manufacture an estimated 10,000 counterfeit oxycodone 30mg tablets." The affidavit contained over 50 paragraphs, was 22 pages long, and contained photographs of Dauphinais and his companion placing the tableting machine in the car at the Royal Oak residence, and of the exterior of the Ferndale residence.

A magistrate judge approved and issued the search warrant for the Ferndale residence on November 12. Four days later, law enforcement executed the warrant and seized the tableting machine, marijuana, psilocyn and psilocybin (mushroom) powder, drug paraphernalia, and two firearms. Officers did not find any fentanyl.

### B. Procedural Background

The Government filed an initial indictment against Dauphinais on November 30, 2021, and a superseding indictment on February 8, 2022, the latter of which charged one count each of possession with intent to distribute psilocyn and psilocybin, possession with intent to distribute marijuana, possession of a tableting machine to manufacture a controlled substance, possession of a firearm in furtherance of a drug-trafficking crime, and maintenance of drug-involved premises.

On June 24, 2022, Dauphinais filed a motion to suppress the evidence seized from the Ferndale residence, arguing that the affidavit in support of the search warrant failed to establish probable cause and that the good faith exception did not apply because the affidavit was "bare bones" and failed to establish a nexus between the Ferndale residence and criminal activity. The Government responded in opposition to the motion on July 13.

On August 10, 2022, the district court held a hearing on Dauphinais's motion to suppress. There, Dauphinais's counsel urged that the affidavit failed to provide a nexus between the Ferndale residence where Dauphinais's mother lived and the alleged criminal activity, rendering the warrant insufficient to establish probable cause and ineligible for the good faith exception. The Government responded that the affiant's observations regarding the delivery of the tableting machine to a residential address, Dauphinais's ordering of blue dye sometimes used for counterfeit pills along with the tableting machine, the immediate transfer of the machine by Dauphinais from the delivery address at Royal Oak to the Ferndale residence, and the affiant's analysis of these facts based on her training and experience gave "rise to the level of suspicion" needed to sustain probable cause. In the alternative, the Government submitted that the good faith exception to the exclusionary rule applied because the affidavit supplied grounds for reasonable reliance.

The district court granted the motion to suppress. Stating that the affidavit lacked "facts showing that illegal pill making was in fact taking place at this address" or "observations that pills were made and taken out of the [Ferndale residence] for distribution," the court determined that the warrant lacked probable cause due to an "insufficient nexus between the [Ferndale residence] and evidence of illegal pill making." The court also concluded that because "the affidavit was so lacking in probable cause to render official belief in its existence entirely unreasonable," the good faith exception did not apply. The Government timely appealed both determinations.

## II.   STANDARD OF REVIEW

A district court's order granting a motion to suppress is subject to clear-error review of its factual findings, and de novo review of its legal conclusions. *See United States v. Waide*, 60 F.4th 327, 335 (6th Cir. 2023) (quoting *United States v. Whitley*, 34 F.4th 522, 528 (6th Cir. 2022)).

## III.   ANALYSIS

### A.   Probable Cause

The Fourth Amendment guards against unreasonable searches by the Government.  U.S. Const. amend. IV.  "The 'chief evil' deterred by the Fourth Amendment is the physical invasion of the home."  *United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016) (quoting *Payton v. New York*, 445 U.S. 573, 585 (1980)); *Thacker v. City of Columbus*, 328 F.3d 244, 252 (6th Cir. 2003)).  Probable cause to sustain a search warrant requires that "the information known by the affiant and conveyed to the magistrate makes it fairly probable that there will be *additional* contraband or evidence of a crime in the place to be searched."  *United States v. Brooks*, 594 F.3d 488, 494 (6th Cir. 2010) (emphasis added) (citing *United States v. Berry*, 565 F.3d 332, 338 (6th Cir. 2009)).  The evidentiary burden is "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion."  *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (citing *United States v. One 1984 Cadillac*, 888 F.2d 1133, 1135 (6th Cir. 1989)).

"When determining whether an affidavit establishes probable cause, we look only to the four corners of the affidavit."  *Brooks*, 594 F.3d at 492 (citing *United States v. Pinson*, 321 F.3d 558, 565 (6th Cir. 2003)).  The affidavit in support of a warrant application must "provide the required nexus between the residence [to be searched] and the illegal activity."  *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004) (en banc).  Specifically, "[t]he affidavit must contain particularized facts demonstrating 'a fair probability that evidence of a crime will be located on

the premises of the proposed search.'" *United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006) (quoting *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)).

"[W]hether an affidavit establishes a proper nexus is a fact-intensive question resolved by examining the totality of circumstances presented." *Brown*, 828 F.3d at 382. Facts that can give rise to probable cause include, but are not limited to, a defendant's "extensive history with drugs"; intel from "a 'credible and reliable informant'" that the defendant was selling drugs at the time of the warrant application; a controlled purchase of drugs from the defendant; and reports from multiple informants reflecting their purchase of drugs from the defendant. *United States v. Christian*, 925 F.3d 305, 309 (6th Cir. 2019). "[T]he 'veracity' and 'basis of knowledge' of persons supplying" the affidavit in support of the warrant are key considerations. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Though "an officer's 'training and experience' may be considered in determining probable cause, it cannot substitute for the lack of evidentiary nexus . . . prior to the search, between [the location to be searched] and any criminal activity." *United States v. Schultz*, 14 F.3d 1093, 1097 (6th Cir. 1994) (citations omitted).

Here, the affiant provided the basis of her knowledge, alongside detailed observations and photographs. Though Dauphinais contests the inferences and conclusions drawn from these observations, he does not argue that "false information was contained in the affidavit." *United States v. Martin*, 920 F.2d 393, 398 (6th Cir. 1990) (affirming the sufficiency of a search warrant affidavit). The affiant also outlined her qualifications, including her extensive training and specialization in narcotics crimes, licensure as an attorney,[1] and personal engagement in recent

---

[1] One rationale justifying the totality-of-the-circumstances analysis is "that affidavits 'are normally drafted by nonlawyers in the midst and haste of a criminal investigation,'" and therefore, "[t]echnical requirements of elaborate specificity once exacted under common law pleading have no proper place" in this inquiry. *Gates*, 462 U.S. at 235 (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965)). Whether this justification ought to apply where the affiant is an attorney is unclear. But because the issue is not determinative in this case, we need not address it.

investigations that resulted in discovery of fentanyl operations and those observed here—specifically, the same company processed the order for the tableting machine; the purchaser shipped the order to a residential, not a business, address; and the purchaser shipped the machine to one residential address and then moved it to another residential address. These indicia weigh in favor of finding probable cause.

Other considerations also weigh on the totality of the circumstances test, however. Probable cause turns on the probability, not simply "the 'mere possibility,'" *United States v. McClain*, 444 F.3d 556, 563 (6th Cir. 2005) (quoting *United States v. Ukomadu*, 236 F.3d 333, 337 (6th Cir. 2001)), of discovering the "fruits, instrumentalities, or evidence of crime" at the location to be searched. *Zurcher v. Stanford Daily*, 436 U.S. 547, 550 (1978). *United States v. Abernathy*, 843 F.3d 243 (6th Cir. 2016), illustrates this distinction. *Abernathy* held that "the connection between the small quantity of marijuana paraphernalia recovered from Defendant's garbage and his residence" during a police trash pull was "too logically attenuated to create a fair probability that more drugs were in the residence." *Id.* at 255. Unlike other cases where the discovery of some drug paraphernalia contributed to a finding of probable cause, the warrant application in *Abernathy* lacked any other "corroborating evidence tying the defendant to drug activity." *Id.* at 256.

*Abernathy*'s discussion of attenuated evidence is instructive here. Though the tableting machine is more costly and conspicuous than the marijuana discovered in *Abernathy*, unlike that marijuana, Dauphinais's machine was not itself illegal. Much like drug paraphernalia must be "combined with other evidence of the resident's involvement in drug crimes" to establish probable cause, *id.* at 252, a lawfully purchased tableting machine requires additional evidence of illicit

activity to satisfy the nexus inquiry. The affidavit to search the Ferndale residence lacked such additional evidence.

The Government relies on *United States v. Anderson*, No. 22-3489, 2023 WL 2912182 (6th Cir. Apr. 11, 2023), in which U.S. border agents discovered and searched an "internationally shipped package" containing "two pill press die sets in the shapes of a skull and a clown." *Id.* at *2. The package was mislabeled in two respects: the manifest labeled the contents as "an 'iron ring,'" not pill press die sets, and listed the recipient as "'Dondada God,' a seemingly fictitious name not associated with the" shipping address. *Id.* Invoking *Anderson*, the Governments points to several facts that it claims close the probable cause gap: Dauphinais's purchase of a tableting machine "capable of producing thousands of pills per hour"; his requested delivery to the Royal Oak residence, which lacked indicators that he lived or ran a business there; Dauphinais's transport of the machine to a different residence immediately after delivery; and his order of a blue binding agent.

*Anderson* does not alter our analysis. As an unpublished opinion, *Anderson* is not binding precedent, *see Gunner v. Welch*, 749 F.3d 511, 515 (6th Cir. 2014), and it is distinguishable. Unlike Anderson, Dauphinais openly purchased the tableting machine and accessories from a Texas-based company, responding to queries regarding his purpose by stating that he sought to engage in research and development of superfood tablets. Investigators' research revealed that Dauphinais registered himself as "the organizer and resident agent" of a company with the appropriate Michigan agency. Dauphinais also placed the order using his actual name and the residence associated with his driver's license. The affidavit never suggested that the residential property here functioned as "a 'stash house' or drug-processing location." *Anderson*, 2023 WL 2912182, at *2. Details from surveillance of the Royal Oak residence, such as the affiant's

statements that investigators observed the delivery of a washing machine, a walk in the neighborhood by a woman who exited the dwelling, and Dauphinais's mother's picking up an elderly woman on oxygen from inside the residence, are incongruous with a drug processing operation. Observation of the Ferndale residence also failed to give rise to an inference of illegal activity. Because the facts and inferences giving rise to probable cause in *Anderson* are absent from this case, *Anderson*'s analysis and holding simply do not control here.

In sum, the affidavit states that Dauphinais and his companion received the tableting machine at the Royal Oak residence then transported it to the Ferndale residence in the middle of the day; the pair left for another residence and picked up a large package; and Dauphinais's mother arrived at the Ferndale residence shortly thereafter, where she retrieved a package from the front door, "picked up a few sticks around the front yard," and then joined another woman for a walk down the street. Even under the "nontechnical, common-sense judgments of laymen," *Gates*, 462 U.S. at 235-36, the affiant failed to allege facts reasonably raising the inference of criminal activity at the Ferndale residence. On this record, the totality of the circumstances does not support a finding of probable cause. The district court appropriately determined the warrant lacked probable cause.

## B.      Good Faith Exception

Evidence obtained under a warrant supported by an affidavit that fails to establish probable cause may nevertheless qualify for the good faith exception to the exclusionary rule. *See United States v. Washington*, 380 F.3d 236, 240-41 (6th Cir. 2004). The exception arises out of recognition that "only police conduct that evidences a 'deliberate, reckless, or grossly negligent' disregard for Fourth Amendment rights may 'outweigh the resulting costs'" of suppression. *United States v. Kinison*, 710 F.3d 678, 685 (6th Cir. 2013) (quoting *Davis v. United States*, 564

U.S. 229, 238 (2011)). Thus, the "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984).

Although a finding of good faith "requires a 'less demanding showing than the "substantial basis" threshold required to prove the existence of probable cause in the first place,'" an affidavit must provide facts connecting the subject of the search to the suspected illegal activity. *Frazier*, 423 F.3d at 536-37 (quoting *Carpenter*, 423 F.3d at 536). Evidence of drug trafficking often provides this link. *See, e.g., United States v. Hines*, 885 F.3d 919, 928 (6th Cir. 2018) (applying the good faith exception where affidavit failed to supply probable cause but did connect the searched residence "with evidence of drug trafficking"); *Frazier*, 423 F.3d at 535 (applying the good faith exception where a confidential informant "recorded [defendant's] participation in two drug deals" and the affiant "had included and sworn to this information in five related warrant affidavits presented contemporaneously to the magistrate judge"); *United States v. McCoy*, 905 F.3d 409, 413 (6th Cir. 2018) (applying the good faith exception where the application for a warrant provided sufficient "basis to believe that at least one of the defendants was engaged in a continual, ongoing drug-trafficking operation," raising the inference that "drug-related contraband was likely to be found in his home"). "[T]he fact that [the defendant] w[as] known to have participated previously in the type of criminal activity that the police were investigating" can also trigger the good faith exception. *McPhearson*, 469 F.3d at 526.

Our precedent recognizes "four instances" in which the good faith exception does not apply, of which "[t]he only one relevant for our purposes is whether the warrant was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Kinison*, 710 F.3d at 685 (quoting *Leon*, 468 U.S. at 923). "Affidavits that are 'so lacking in indicia

of probable cause' have come to be known as 'bare bones' affidavits." *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005). A bare bones affidavit is one that "states suspicions, beliefs, or conclusions without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir. 1996).

Our cases recognize several features that can trigger application of the good faith exception. An affiant's extensive and relevant experience, for instance, weighs in favor of applying the exception. *United States v. Van Shutters*, 163 F.3d 331, 337-38 (6th Cir. 1998); *see also United States v. Reed*, 993 F.3d 441, 452 (6th Cir. 2021) (applying the good faith exception where the affiant's extensive drug investigation experience supported "his belief that probable cause existed to search [the defendant's] home"). Likewise, an affiant's description of the location to be searched "with such particularity that a common sense inference is that the affiant visited the premises himself and presumably either observed [the defendant] in the residence, or determined through investigation that [the defendant] frequented the premises" suggests "that only a police officer with extraordinary legal training would have detected any deficiencies in" the affidavit, militating in favor of the exception. *Van Shutters*, 163 F.3d at 337. We have also explained that a limited inference based on "great number of details set out in the affidavit" coupled with a "highly experienced investigator" serving as the affiant, can satisfy the good faith inquiry. *Laughton*, 409 F.3d at 750. *Schultz* is similarly instructive. 14 F.3d at 1097. Centered on a warrant to search safe deposit boxes alleged to contain drug trafficking records, *Schultz* acknowledged that a law enforcement agent's "'training and experience' . . . cannot substitute for the lack of evidentiary nexus in [a] case, prior to the search, between the [location to be searched] and any criminal activity." *Id.* at 1097. It observed, however, that "the connection" between the alleged

crime and the safe deposit boxes "was not so remote as to trip on the 'so lacking' hurdle," and therefore applied the good faith exception. *Id.* at 1098.

Determining which side of the good faith line this affidavit falls on is not an easy task. On one hand, prior to the search, law enforcement did not observe Dauphinais—nor any other person at the Ferndale residence—use, distribute, or otherwise engage with illegal drugs. Nor did the affidavit show that Dauphinais had a history of drug dealing or other illegal activity. Our precedent states that where "the 'evidence in the affidavit connecting the crime to the residence [was] "so vague as to be conclusory or meaningless,"'" the good faith exception does not apply. *McPhearson*, 469 F.3d at 527 (quoting *Frazier*, 423 F.3d at 537).

On the other hand, the Government argues that the good faith exception applies here because the affiant's professional background and "experience in other cases leading to the discovery of illegal pill-making operations" allowed her to reasonably infer that Dauphinais's behavior reflected an attempt to avoid detection by law enforcement. The four corners of the affidavit contained over 50 paragraphs and 22 pages that included the affiant's lengthy recitation of her training and experience, her extensive investigation, detailed observations, photographs, and the similarities between these observed facts and recent illegal pill-press operations. As the Government urges, the affidavit "included dozens of paragraphs detailing physical surveillance, as well [as] documentary and online investigation, that were consistent with an illegal pill-making operation at the Ferndale address." Based on her experience, the affiant drew relevant comparisons between Dauphinais's behavior and those of individuals implicated in recent, substantiated illegal pill-press operations.

This affidavit is distinct from the classic bare bones affidavits of our precedent. The level of detailed description distinguishes it from the bare bones affidavit in *McPhearson*, where the

factual basis of the warrant consisted of a single paragraph observing that the defendant "was arrested for a non-drug offense with a quantity of crack cocaine on his person" outside of the location to be searched. 469 F.3d at 524, 526. The affiant's extensive investigative work here also differentiates this case from *Brown*. There, the affiant failed to conduct any surveillance or investigation, and only "a passing reference to [the defendant's] car registration" at the search location "connect[ed] the residence to the alleged drug dealing activity." 828 F.3d at 385. In contrast, the affiant's investigative work here included surveillance over multiple days.

Here, the affiant's training and experience linked Dauphinais and the Ferndale residence to the alleged criminal activity. We have held that such an approach can justify application of the good faith exception. *See Schultz*, 14 F.3d at 1097–98; *Van Shutters*, 163 F.3d at 337–38 ; *Reed*, 993 F.3d at 452. And like *Schultz*, "[t]here is no evidence" here "that [the affiant] gave a knowingly false affidavit or otherwise acted in bad faith." 14 F.3d at 1098. Under such circumstances, the good faith exception can save a "facially valid" warrant that does not satisfy probable cause. *Id.*

Given the specified experience and training of the affiant and the lengthy affidavit linking facts observed during the investigation of Dauphinais with the distinctive features of proven illegal pill manufacturing operations, we are not convinced that "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23. This "affidavit was not so lacking in probable cause as to render official belief in its existence entirely unreasonable." *Frazier*, 423 F.3d at 537. The affidavit satisfies the good faith exception.

## IV.    CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment that the warrant lacked probable cause but **REVERSE** its determination that the good faith exception did not apply and **REMAND** for proceedings not inconsistent with this opinion.